Good morning, Your Honors. May it please the Court, my name is Tassifai Sadiq. I represent the plaintiffs Joe Wakeland and Daniel Smith in this case. And I, we appeal this case because there was two fundamental errors in the district court decision. We can divide them into two areas. One is the ruling on the Dalbert issue, which excluded our experts, primarily O'Connor and Sawyer. The second area is even assuming, you know, that the district court was correct in excluding these two experts. Is there sufficient evidence that plaintiff presented to be able to create a disputed issue of fact to really successfully raise or prevent summary judgment in this case? I believe that even assuming, you know, that under California law, there is no requirement for those, and we should have really been allowed to simply go to trial based on the testimony of our experts without those. I believe we presented enough evidence to stand up any kind of a Dalbert challenge with respect to our experts. And Dalbert usually requires that the expert opinion be grounded on scientific methodology and reliable facts. If you look at the opinion of Dr. O'Connor with respect to chromium-6, these are the two chemicals in play in this case are chromium-6 and TCE. If you take chromium-6, Dr. O'Connor relied on the air model prepared by the agency of toxic substance and the department of California Health Department. In that air model at the Remco site at the ground zero where plaintiffs were frequenting, you know, the Luna's market, the air model provided ambient air concentration of 10 micrograms for the period from 1968 to 1975. And it also provided five micrograms for a period from 76 to 95, I mean, 89, I'm sorry. So essentially, this is used by Dr. O'Connor to establish a dose that is necessary to cause this wetland gastritis. What he did was he used the 10 microgram and he used that information to convert it into a cumulative average compared to a literature epidemiological study done by Gibbs. If you look at Dr. O'Connor's declaration in support of our opposition to the summary judgment, on page 739, he has a chart where he compared the exposure, the dose level in Gibbs that caused irritation of lung with Joe Wakeland's exposure. There you will see on page 739, you will see that Joe Wakeland's dose exposure compared to the occupational exposure conducted by Gibbs with respect of lung irritation, you'll see her exposure dose was twice that of the workers. Sure, I mean, we're talking about lung irritation in this case as opposed to gastritis, but the fact is, you know, there is a measurable dose, you know, that he used to compare it to the workplace exposure that caused lung irritation. Usually, when you have gastritis, the lung and the hexavalent chromium comes into your mouth and it is swallowed with your saliva into your stomach. That's when gastritis is caused. Essentially, we have here a sufficient amount of dose provided by Dr. O'Connor to show that Ms. Wakeland was actually exposed and she has sufficient dose to cause her gastritis. The other article that Dr. Sawyer also relied on is Lucas's article. You'll see there in the Lucas article, gastritis was caused by exposure at the workplace and the exposure really of the chemical dose ranges from 1 to 20 micrograms. And Dr. Sawyer established, you know, that Ms. Wakeland's exposure is really about 4.9 micrograms, which is really almost in that range where it is capable of causing gastritis. So what you have here is Dr. O'Connor providing sufficient dose information from which a reasonable jury can conclude, you know, that there is connection between gastritis and the chemicals that was emitted by the defendant. Also, what's important in this case is really is Dr. O'Connor's opinion on chromium is something that is insufficient or weak under DARPA, you know. I mean, I think he relied on the ATHDR air model study. That is something that scientifically accepted by all air modelers for estimating ambient concentration at any location, historical contaminated site, you know. And he used that and he also compared it to the literature, you know. In that sense, you know, what he did was really scientifically acceptable and the facts he relied on were really something that any scientist would rely. With respect to chromium, he also comes up with the peak exposure. The peak exposure occurs when there is wind that actually blows in the area and takes the chromium to a receptive site, to the plaintiffs. In those situations, you know, Dr. O'Connor said, you know, that the peak exposure usually is much, much higher than the cumulative annual average. And usually, the peak exposure is really not addressed in any air model. And the question is really what the district court did was, even though they did not challenge the idea, the scientific validity of peak exposure, what the district court did was ask, did, we didn't have any proof to show that Ms. Wakeland was at that particular location at that particular time when wind was blowing with a peak chromium exposure. Sure, Dr. O'Connor said, look, I can't tell you exactly when Ms. Wakeland was there. All I can tell you was the probability that she would be hit by a peak exposure during the time period, you know, that she was there was much more higher. It's more probable than not. I mean, that is really what his opinion was. And I don't think, that he should be expected to establish that Ms. Wakeland was at this particular site. Mr. Sadek, after 1975, the TCE exposure, did either of the experts, Dr. O'Connor or Dr. Sawyer testify that there was a causal connection between the TCE exposure and the injuries that were alleged to come from TCE post 1975? Yes, your honor, I understand. Post 1975, there was cessation of TCE use. The fact that there was cessation does not mean that the TCE was not in the environment there. There was no cleanup done until 2006. So essentially, what you have is really a qualitative kind of exposure. Like, for example, he showed in 2006, when the groundwater was being cleaned, his 2006, Dr. O'Connor found out from the people who were remediating the site that TCE and TCA in the groundwater were relatively in existence, about 300 to 4,000 parts per billion in the groundwater. So essentially, the exposure from TCE, even though was not quantified, was simply used in a qualitative sense, you know, because people were playing in the creeks. People were going to Luna's Market where the groundwater was sometimes the groundwater is really is so low that it percolates out. You know, the water comes out during the rainy season. People who go there will be essentially export to TCE. In this case, you know, your honor, the TCE is not used for the purpose of establishing specific injury to these plaintiffs. The TCE is used to show that because these people were exposed, even after 75, to the TCE that existed in the environment, that there has to be some kind of medical monitoring for these people, you know. That's the only reason the TCE comes into play in this case, your honor. So, but did the experts, the two experts, explicitly make the causal connection in their expert reports between the TCE exposure after 1975 and the injuries that they The TCE was not simply used for the purpose of gastritis and poor dentation. That was the injury that we are claiming, you know, the present injury that we are claiming with respect to wetland is a gastritis and her poor dentation. That is primarily caused by chromium, you know. And so, to the extent, you know, that we're talking about present injuries, there is no really TCE associated present injury that is manifested by these plaintiffs, you know. The TCE was really something for future medical monitoring, you know. And the other thing, is the district court simply concluded, you know, that the opinion of Dr. O'Connor with respect to TCE prior to 75 is simply speculative, you know. And it's simply improperly extrapolated from TCA. How could that be, you know? Dr. O'Connor relied, number one, on the fact, you know, that there was in 1980, an employee testified in 1980, Remco used 40 gallons, 55 gram a month of TCA. That is a fact that one can use if TCA is a solvent substituting TCA and a defendant uses 40 grams of TCA a month, one would assume, estimate, you know, that there must be some TCE estimate that could be made from that use prior to 1975. The other fact he also used was that, as I said, in 2006, the groundwater was tested. There was in the groundwater both TCA and TCE was found, you know. Because the relative combination of the two, TCE and TCA, in the groundwater was one was 300, TCA was 400. So he can say, look, based on this, prior to 75, it is reasonable to assume that almost half or two-thirds of TCE was used. That's not really speculation. That's a fact that relied on, you know. And also what he did was, he assumed or he found a fact, which is that TCE was not only used for degreasing, you know, prior to 75. TCE was used simply to contain the dust on the parking lot, you know. They were spilling TCE in the parking lot, you know. So if you compare TCA degreasing with TCE degreasing, that's one thing. But he added to the fact, you know, that prior to 75, TCE was used as a dust container and poured on the surface, essentially providing a larger amount of emission from TCE compared to TCA. TCA was 1980. It was not really poured on the ground at that time. So those are the facts, you know, that he relied on. And I would submit, you know, that it cannot be said, you know, that his factual reliance is purely speculative. It's really based on some kind of proper estimate. The thing is, what is very important is, what we have is really historical contamination, and there is no record by the defendant to show how much TCE was used, how much they purchased. So essentially, the court should allow scientists like Dr. O'Connor to make a reasonable, rational estimate, you know. And air model is really the same kind of thing, reasonable, rational estimate, you know. And as a result, you know, that plaintiffs should not be tasked to come up with precise information in terms of the quantity of TCE used at the facility. The other thing I think which is important in this case is, I would probably reserve two minutes for rebuttal from my point, is assuming, you know, that the district court was correct in excluding O'Connor and Sawyer's opinion. The district court did not say anything with respect to Dr. Vera Byers, our health expert, and Linda Remy, which is epidemiologist. Dr. Linda Remy did her study. She was not hired by us. She was an employee of the university. She started out independent research by her own. So what she did was, she used the diagnosis, medical diagnosis of the community in Willits to determine what kind of diseases are prevalent as a result of Remco in this facility, in this area, you know. And what's important is the population of Willits is only 5,000. And if you look in her report, she has 1.6 million diagnosis, okay, to determine what kind of she determined, you know, one of them is gastritis, digestive disorder. So her findings is really very robust to the extent, you know, that she used quite a huge sample to come up to that conclusion, you know. So essentially, if we use Dr. Remy's opinion and Dr. Byers opinion, it should be, we should be, the plaintiffs should be allowed to any kind of summary judgment. And I believe, you know, that the district courts made an error in simply dismissing plaintiffs experts and granting summary judgment against plaintiffs in this case. Thank you, counsel. You have almost three minutes here for Mr. James. May it please the court and good morning. My name is Kali James, the law firm, Morgan, Lewis, and Bacchius. I represent the appellees in this matter. As the court is likely aware, this is the latest appeal in a series of related cases. There was the Avila action, there was an appeal that's been submitted on the briefs that was scheduled to go right before that. But there was also an omnibus appeal in the Avila matter that was filed several years ago. And an issue, an opinion was issued by this court in that case in January, 2011. And among many other issues, there are issues in that decision that are implicated here. And the citation for that opinion is 633 F3rd 828. I'd like to first talk about the issue raised in appellant's papers regarding what the proper standard is in these types of cases. Fundamental to the appeal is the assertion by appellants that the district court erred by applying the wrong standard, in effect, applying a standard that heightened their burden and held them to a higher standard than's required under California law. And they cite primarily to the Rutherford case and claim that under California law, they were only required to show a reasonable medical probability that exposure to the chemical was a substantial factor in causing his or her illness. They go on to argue that as long as they can show that exposure was more than merely theoretical or infinitesimal, and that they can provide some scientific evidence of a link between the chemical at issue and the injury alleged, then the exposure is deemed a substantial factor and their causation burden is met. They assert the district court erred by using a quote federal causation standard that required them to establish an actual level of exposure or dose and then link that to a known threshold level. However, they are misstating, really confusing the law and the district court's ruling. As stated by this court in the Avila opinion I mentioned previously at 633 F3rd 836, this court set out the standard. It said in California in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. That's citing the Jones case. They go on and say plaintiffs must also establish that substance at issue was capable of causing the injury alleged. This is general causation and that the substance caused or was a substantial factor in causing the specific plaintiff's injury. This is specific causation and they cite to the Hanford case as well as the Jones case. The district court employed nearly exactly the same language in its underlying opinion at issue here at page four. And the cases cited in this passage further outline what it means to establish that first issue, general causation. And that says, and this is from the Hanford case as an example at 1133, 292 F3rd 1193, that the plaintiff's expert must establish, quote, whether exposure to a substance for which a defendant is responsible at the level of exposure alleged by plaintiffs is capable of causing a particular injury or condition. Well, counsel, I actually appreciate the help with California law because it's not my natural habitat. But it seems to me that a lot of what the district court did here was really weighing of evidence rather than looking at it from a summary judgment perspective. It may be that ultimately the criticisms of these scientists' opinions are correct, but it seemed to me that the court went beyond simply accepting them on their own terms as true, which you have to do for summary judgment, and did something more. Because this isn't sort of a junk science case where people have gone off and said, you know, we know about UFOs and that's what we're going to talk about. It's much more tied to real science. And it seems to me that there probably was evidence that was sufficient under the standard you've just described. Where am I going wrong? Sure. No problem, Your Honor. As this court is well aware, this has the funny interplay between the summary judgment standard and the exclusion of expert evidence. And it's well settled that the exclusion of evidence is governed by the abuse of discretion standard. Now, what does that mean here? Well, in federal cases, the applicable standard for exclusion of evidence is Federal Rule of Evidence 702 and Daubert and its progeny. And it sets forth the requirement for what an expert must do in order to meet a minimum standard of reliability. Federal Rule 702 says that that's where I think you're briefing, at least, and I parted ways because it seemed to me that this evidence at least met the those standards for admissibility. Then so that took me over to to then what do we do with that evidence that is otherwise reliable scientifically that may then the question becomes does it prove the case, which is a different question. But I have I have a hard time seeing why it doesn't meet the Daubert standard. Well, the part of the gatekeeping role of Daubert and its progeny is that the trial court is required to examine that data and the underlying science to determine whether the experts' ultimate conclusions fit with that underlying data. And it says that if there is a gap, if you cannot bridge the gap between that opinion and underlying facts and data, it is the district court's obligation to exclude that evidence. That is the minimum standard of reliability that the court is asked to examine. And to some level that requires a weighing of that scientific evidence. It doesn't. It doesn't. Because in every case like this, there's going to be a battle of experts. One will say there's causation. One will say there isn't. But presumably both of them meet the Daubert standard, even though they've used the same data and come to different conclusions. So it can't be true that the district court at the gatekeeping level picks an expert over another expert because they like the way they've dealt with the data better. So I guess I'm not really sure what more is required than was done here to meet the basic gatekeeping, which leaves open your other arguments. But I guess I'm struggling with this question. What's absolutely critical to understand here is that our argument does not raise the issue of a battle of experts. We did not cite to our own experts, nor did the underlying court cite. Our argument is based entirely, and the district court's opinion is based entirely, on what defendants or plaintiffs experts actually testified to and the studies that they cited and the underlying facts and data. This did not require the district court to balance and make a decision between whose expert was more correct. Maybe I could try it this way. I think I fully appreciate the gatekeeping function that you're describing. So let's talk about TCE, if we could, please, for a minute. Because I viewed, maybe this is overly simplistic, but I viewed O'Connor's testimony as being there to establish exposure and Sawyer to establish a threshold of the plaintiffs needed to show to show harm. Absolutely correct. So it's an oversimplification to be sure. But it seemed to me that the district court judge was concerned as to TCE, that the science the plaintiff's lawyer, forgive me, expert was relying upon was, it was too great a leap for her that the error modeling based on TCA was inherently assuming that TCA was going to act like TCE and that that was too great a leap. She didn't think that the science there was necessarily buttoned down sufficiently to meet 702 standards. That's my understanding of her ruling. That's, I'm sorry, I didn't mean to cut you off. That's okay. You can cut me off. Is there something you wanted to say before I go on? If I've got that wrong, I'd want you to correct me. I would say that is certainly part of what the district court referred to on the TCE issue. So circling back to, I think it is only part, but I'm just trying to break it down. Circling back to Judge Graber's question then, it seems to me that the expert, Mr. Dr. O'Connor, came back in his rebuttal report and tried to respond to those concerns about the methodology that he used. And that when I read the order from the district court, she found it unpersuasive, but where does she really say that this didn't, that he didn't sufficiently answer the question such that it should be excluded rather than weighed? What exact language are you looking at here? Well, I think the more important issue is not the, whether Dr. O'Connor did a sufficient conversion from TCA to TCE, but even if you took it as a one-to-one conversion, what that meant in terms of the likelihood of causing, whether there was a significant exposure that posed a significant risk to allow for medical monitoring. Because to clarify the question you asked, Joanne Wakelin claims no injury caused by TCE. TCE only comes into play as it relates to the medical monitoring. And on that issue, the TCA public health assessment that Dr. O'Connor relies upon to convert into TCE mapped exposures, just like the Chrome 6 exposures in the general vicinity of the RIMCO facility. And that study taken on its face shows offsite concentrations of TCA. And even if you take them at a level, at a one-for-one exchange of only about 250 micrograms per cubic meter for any site where you could be exposed outside of the RIMCO grounds. Now you, then you compare that to Dr. Sawyer's testimony. And he says that 300 micrograms per cubic meter is the absolute minimum that he could look at before he could conclude to a reasonable degree of scientific certainty that any human injury could result. Your brief says that counsel, but I have a problem interpreting the excerpt to back that up. So maybe you want to take this up when you come back up to the podium, but it's, oh yeah, that's right. Maybe it is good then that I interrupt you now. And thank you, Judge Gabriel, because it's a, it's a page 144, 145 is the language that I've got highlighted here. And I'm trying to get to where you are, which is to say that Sawyer has opined that it's, that it's 300 grams per cubic meter. I apologize. I don't have that, that testimony readily accessible. Okay. So, so I do, and you will in about five minutes, but, but afterwards, when we look back at this, if we disagree with your interpretation of this, then what? Well, I think that if, if, if it's 300 or if it's 250 or 200 that Dr. Sawyer testified to, then that's only the beginning of the medical monitoring inquiry. Medical monitoring is dictated by the Potter case and the Potter case sets forth a variety of showings that the expert must make to, to, uh, to allow for it. And, um, and, and that's an important concept because it is allowing for an ongoing award for something that may or may not happen in the future and therefore requires this significant exposure causing a significant risk. So you've got, you've got Dr. Sawyer, uh, uh, testifying to a threshold and give or take something in the 300 range, uh, is my recollection. And, and it's certainly that's, you know, that's, that's what I recall from the, from the papers and from the deposition. Um, but that doesn't get to the issue of what level, uh, would be required to call it a significant risk that some significant injury, i.e. cancer or something similar could have been occurred, you know, now 38 years after the last exposure. And on that issue, plaintiff's experts provide nothing. There is nothing to bridge that gap between this claim that a significant risk of a significant, uh, injury based on a significant exposure ever occurred when we're talking about very, very, uh, small, uh, uh, types of, of exposures to TCE and only for Joanne Wakelin, mind you. Right. Uh, my understanding is that Smith was born in 81, I think. New Year's Eve of 1981, actually. All right. So the, the district court judge getting back, circling back to what the ruling was really found fault for the reason, one of the reasons I've described on TCE was the O'Connor exposure. And then you and I may have a difference of opinion. Maybe I'm incorrect. Uh, but anyway, uh, as to the threshold level and those were the problems that she had with the, what I'll call the science, correct? I believe so. Yes, Your Honor. Okay. All right. Uh, now going to the Chrome six case and for Joanne Wakelin specific industries, injuries, she alleges that her gastritis and her poor dentition were caused by those exposure. And remembering that this is an abuse of discretion standard, um, uh, counsel on the other side referred to, uh, their experts, uh, reference to two cases, the Gibbs case and the Lucas case. Now the Gibbs case doesn't discuss gastritis whatsoever. It has, uh, it, it, uh, examined workers and comes to, uh, and, and notes exposure levels at which certain other types of injuries in case, uh, uh, uh, arose, including this nasal irritation. Now there's nothing, nothing else in the report that links and any of the expert reports that draw a direct line between nasal irritation and gastritis in the first census. The, the other, uh, study is the Lucas case, which also doesn't discuss, uh, gastritis specifically. It talks about, uh, workers while working, developing gastrointestinal, uh, distress. Um, but then that clears up as soon as the exposure issues. Nevertheless, Dr. Sawyer relies upon that and comes up with this, uh, his threshold level of exposure to five micro four micrograms per seven and a half years. Um, and the record shows that Ms. Wakelin's exposures did not meet, uh, that level. Now Dr. Sawyer goes back and does try to calculate something and comes up with a number for the period of time, 1971, 19 to 1975. And then even admitting that that's not long enough or that her hourly exposures were not long enough, he just says, well, it's within a But there's no, there's nothing in the law and there's nothing in the science that it says that an expert can just say, well, I've set a threshold, this person doesn't meet it, but I'm going to call it okay by just saying it's within a reasonable range. And under looking at that evidence, looking at the threshold that Dr. Sawyer himself stated, the underlying facts and data, the data, uh, from the site, the court said, I review this and I find that the gap is too far between those underlying facts and data, his own, his own testimony, testimony, and the ultimate conclusion that he renders. And therefore it fails to meet minimal standards. Why was Dr. Byers testimony excluded? Dr. Byers testimony wasn't excluded. And this goes to the last, uh, issue, right? It was excluded in a sense. Um, but the motion was granted to exclude it without explanation. And this also goes to the last issue raised by council with respect to Dr. Byers and Dr. really was kind of characterized at the top card in the house of cards. And if you read her report, uh, for both, uh, really primarily Joanne Wakelin, but also Danielle Smith, she says very explicitly, I rely exclusively on Dr. O'Connor and Dr. Sawyer for all exposure testimony and all general causation testimony and their dose levels, even though at the time she wrote it, they had not, uh, calculated any, any sort of dose. And so to the extent that, that, uh, um, Dr. O'Connor and Dr. Sawyer are excluded, then she has nothing on which to base her opinion. Really her only task in this case was to examine the, the, the plaintiffs, confirm the presence of the injury and then rule out, uh, or, uh, uh, rule out any potential other cause. So she is excluded because the entire foundation of her, uh, of her, uh, ultimate conclusions, uh, get wiped away in the O'Connor and the Sawyer analysis. Now with respect to Dr. Remy, Dr. Remy, uh, conducted this longitudinal analysis and this Dr. Remy, actually a prior version of this, uh, of her report, uh, is, uh, addressed in the Avila action. But what she does is she examined whether there were elevated rates of hospital hospitalizations in Willets during applicable time periods. And she finds that there was a generalized elevation for certain groups, male or female during certain periods of time. Now, can that replace O'Connor and Sawyer? And the answer very clearly is no. She, what, she does not render any opinions on any specific plaintiff, you know, particularly, uh, Miss O'Connor or Miss, uh, uh, Smith and Miss Wakeland. Um, nor does she, uh, tie it to any, um, um, specific chemical, nor does she, uh, her analysis even discuss gastritis or poor dentition or cancer, which would be the primary issue raised by a medical monitoring claim. It provides some, it provides evidence at most that there could be something going on in Willets that differs it from, differentiates it from another, uh, site, but it doesn't actually do anything to tie it to the and the general causation analysis that would otherwise have been provided by, uh, the other experts. May I ask one question, one more question quickly? Sure. What should I do with this, uh, indication in the record that the, that the, um, uh, chromium six levels may have been orders of magnitude, several orders of magnitude higher than in the public health assessment. Sure. Um, the, what the public and this exhibit, I believe D to the, to the, uh, public health, um, assessment, um, describes the modeling that they performed and, and they, what they did was they conducted a wide range of models and what, and they varied the various kind of data inputs in order to create those models. And that was hours of operation, the, uh, assumptions regarding the efficiency of emission control systems and any number of things. And they did it on conservative or, or liberal basis, you know, uh, high hours, low hours of, of operation, uh, maximum efficiency, low or no efficiency. And it, and it spit out a range of numbers. Um, and, um, but what became the kind of the numbers in the PHA and what was graphed on the maps in there was the set of facts they found most that they could support the most by the underlying record. Now they make this reference that it could have been higher. It also could have been lower. Um, so one, there is, this is what they, and you'll see that in the, in the exhibit D as they give the range, it could have been from as low as a number to as high as a number during the Pacific areas. Now how that relates to, to what, uh, happened here. They make reference, their experts make reference to this language, but they never actually come up with any estimate of what that means for these plaintiffs. They still relied and use the numbers in the PHA, the final numbers, if you will, the PHA that are used as a graph. So they make reference it again, is there a kind of, well, if, if, if that doesn't work, there's the statement that they could have been higher. So kind of forgive me any errors. Does it, does it say, or have I, is my, uh, note incorrect? I wrote that it said likely orders of magnitude higher. No, that's it. That's a correct, that's the correct quote. Okay. Thank you. Thank you, counsel. Mr. Tsadik, you have some, uh, rebuttal time. I'll be brief your honor. Uh, I think I would address, you know, the last point, which is the order of magnitude, which is significant because the defendant was given the opportunity to respond to the draft air model. They submitted all evidence. And one of the evidence was that the drafters of the public health assessment did model the air modeling based on the permits the defendant applied for Mendocino County, which is 16 hours operation. So when they did that in the draft, then evidence came out, you know, that lots of employees came and testified to the drafters that the operation of the facility was 24 hours, you know, instead of 16 hours based on the permit, you know, that they did. That's why I'm number one. Number two, what happened was also the defendant said the scrubber has efficiency of 83 percent, which is actually the default percent. But what the drafters of the, uh, assessment found out was that the scrubbers were not maintained. Sometimes they were not in place, you know, that is the testimony of the employees, you know. So instead of really reversed, completely rewriting the air model concentration, what they did was they put this statement that this is an order of magnitude. If we had done that, it would be much more higher. And so we leave it at that. That's how they did it, you know. And with that, I thank you very much. Thank you, counsel. We appreciate the arguments of both counsel. And the case is submitted.
judges: Tunheim, Graber, Christen